Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable United States Court of Appeals for the Fourth Circuit are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Please be seated. All right, Mr. Camden, when you're ready. Good morning, Your Honors, and may it please the Court. It was error for the district court to deny the motion to suppress in this case. Is it possible for you to speak up or move the microphone closer? Absolutely, Your Honor. Thank you. There are really two issues in the background on this case. First is whether Officer Walker's conduct in seizing and arresting Mr. Coe constituted an unreasonable use of force in violation of the Fourth Amendment, and if so, second, whether suppression would be the appropriate remedy for that violation. This is a little unusual for a criminal case. The typical criminal Fourth Amendment suppression issue. You also made a Bruin challenge. Are you just – you're abandoning that? I just want to make sure. Your Honor, I believe that is currently foreclosed. Right. This Court has held that even as applied challenges under the Second Amendment are not available. Thank you. I just wanted to confirm that. Yes. We'll rest on the briefing. I understand there are some cert petitions pending, but I don't intend to pursue that here. Okay, thanks. But going back to the Fourth Amendment issue, this is a little different than the usual criminal case, which involves a lack of – So we're here on an excessive force claim. Is that correct? Essentially, yes, Your Honor. And that's, I guess, part of – leads to my first question. If we're here on an excessive force claim, why isn't an excessive force claim the proper subject of a 1983 suit rather than a subject for the application of the exclusionary rule? It could be both, Your Honor. So Fourth Amendment issues arise in both contexts, number one. Just because a 1983 action is available does not mean suppression is automatically excluded as a remedy. The – in addition, there's, of course, the procedural bars. Heck v. Humphreys, I believe, requires that the criminal charges be resolved in Mr. Koh's favor before pursuing a claim. They could be both, but it also could be separate because the whole question of a search would go to the – whether there was a legitimate basis for the search. And then the question of a seizure would go to how the search was executed. And those might be two separate things. I agree that it would be the – well, I think it would be the same general issue, whether the officer violated the Fourth Amendment in the seizure or search of Mr. Koh. Well, but the question of remedy is an important one here. We're here on a conditional plea. And the question, if there was a problem with the search, that would be – involve the application of the exclusionary rule, which the Supreme Court has been careful about expanding. And if it was a question of seizure, you have a totally different remedy, which would be one for damages. And given the difference in the remedial scheme between the search and the seizure in excessive force cases, and given the Supreme Court's reluctance to expand the application of the exclusionary rule when there was a proper basis, if there is, for the search or the stop, it might seem, for remedial purposes and analytical purposes, that it's good to disentangle those two. To address, I think, one of the points in the middle there, I think it's important not to get ahead of the Supreme Court. I'll recognize and agree that the trend, I think, has been towards limiting the scope of the suppression remedy in a criminal case. But it has not been abolished yet, and it has not been shunted all to these 1983 actions. But if there was a proper basis for the search, if there was a proper basis for the search, then why would we exclude the evidence that was obtained by virtue of the search? So your objection must be, do you object to the matter of whether there was a proper basis for the search? Yes, Your Honor. There was a proper basis for a search, a hypothetical search, that the officer never conducted. The search that he and the seizure that he conducted that led to the search involved an unreasonable application of force. So Mr. Kempton, can I ask you, what specifically and precisely as you can do you believe the officer did that was an unreasonable seizure within the meaning of the Fourth Amendment? As in the excessive, putting aside the search question, right? So I want to be as granular as we can. What action did the officer take that you allege constituted excessive force? Pointing his firearm with no safety, with his finger on the trigger, into Mr. Koh's side and back as he held him against the car with his left elbow. Okay, so it's not the initial drawing of the firearm? No. Because as I understand, that happened before Mr. Koh was out of the fire. Right. So it's the pointing at him after he's out of the car? After he's out of the car, yes. But didn't he, almost as soon as the officer approached the vehicle, didn't appellant start throwing, try to run away and start throwing the drugs? No, Your Honor. So the officer was walking towards the front of the building. Right. He stopped, he saw, he shined his flashlight. Right. And then he puts his, he switches, and you can watch this on the body cam, he switches the flashlight to his left hand, opens the car door, and draws his firearm. And when he opens the car door, that's when they start, what does appellant do when the officer opened the car door? He freezes, Your Honor. And then what? And then he leans about 10 degrees forward as he's opening it. To grab the drugs and start throwing them around. And he also tries to run away, doesn't he? Well, that's not until later in the encounter. What happens is the officer, and this is in the joint appendix, the officer actually testified at 95 that he opened the door and attempted to grab Mr. Koh. So he opened the door, Mr. Koh sits there, he's leaning with his hands in his lap, leaning about 10 degrees forward. He doesn't shift left or right. He doesn't reach for anything. He doesn't make any furtive movements. The officer reaches in and grabs him. And as he grabs him and is pulling him out of the car, he places his left elbow on Mr. Koh's, he doesn't allow him to fully exit. The officer is standing right there at the door. He jams him in between the car door. This is cutting it awfully fine, isn't it? Because as I understand it, there was a, the circumstances here would give rise to the reasonable apprehension of danger. Would they not? You've got an area in which drug trafficking is prominent. You've got an officer who is alone in the evening. You've got a situation where there's a finding that the officer saw an individual with drugs and handling bags of some white substance. And then we have this argument about, well, what exactly came first? Did he spot the gun before the tasing or did he do this or that? And what's the sequence here? But when you take the situation as a whole, which was that alone late at night, somebody's handling white substance. A gun is found in the waistband. The man would have easy access to the gun. The officer would be in reasonable apprehension, not just of danger, but an apprehension of his life. And didn't the situation in its totality lead to a legitimate concern on the part of the officer that his life was in danger? At the point that he pulled his gun out and pointed it at Mr. Kozback, no, Your Honor. So this Court's cases have approved taking out a firearm. And the government's brief lists some of these cases. There was Burgess, where the officer pointed it downward. The Court's authorized drawing the weapon, Foote v. Dunnigan, for these late-night encounters where there are drugs involved. But it has never – And you're making the distinction here that what, that he not only drew it, but because he had his finger on the trigger? Yes, Your Honor. And probably because he also testified, quote, you never know when you're going to have to shoot someone. That's one of the insights. So he's arguably just itching to shoot somebody from your perspective. And I submit I'm not going to discuss it too much now because we don't have any details. But then, yeah, he has been involved in a – since then in a shooting. Can I – I just have one factual question and then a question about your argument. The factual question, as I understand it – so your position now that I understand it is that it's pointing the gun at him after he's out of the car. But he drew the gun before he was out of the car, correct? Correct. And so the claim is that the officer should have holstered the firearm? Because if you're not challenging the initial drawing of the firearm, then the argument has to be it's by not putting the firearm away or by continuing to point it at him. That's the argument? No, by pointing at it. Okay, pointing. So having it out is – And having his finger on the trigger. Right.  And then the second question is are you challenging the district court's factual finding that your client tried to flee once he was out of the car? No. Okay. No, it's clear that that's what was going on at that point. Sure. And that gets into, I think, the but-for causation here we have really, which is this is not a case where there was some prior – and this is on the suppression remedy. This is not a case where there is some prior act that the officers failed to do, so an omission, like in Hudson with the knock-and-announce requirement, where they just didn't do that but everything else they did was exactly as authorized by the warrant. This is a situation where the officer from the very beginning of the encounter, and under Barnes v. Felix, I think, cautions against trying to – What do you say he should have done? Kept his firearm holstered throughout the entire scenario? No. He can remove the firearm from the holster. There is a difference, and this is throughout the cases, between removing the gun and having it ready in case it needs to be used and finger on the trigger, elbow at the neck, pointing it into somebody's side when that person has their hands up like this and is frozen in place. And that distinction runs throughout a lot of these cases. We've cited a lot of – it mostly arises in 1983 cases where people are suing, obviously, when they have – Where do you think that distinction best arises in these cases? I mean, what language would you point us to? Well, in the cases the government cites, their brief at 17, they highlighted in Burgess that the officers draw their firearms but pointed them downwards. And in Foote v. Dunnegan, this Court noted that the authorization is essentially to draw the weapon. And in all the cases from Tennessee v. Garner, the Supreme Court's first sort of case – So Foote v. Dunnegan, you're saying that the case says the authorization is to draw the weapon, but then does the case go further and say but not to point it at anyone? I don't believe that was at issue in that case or argued as a point. So there's – your case is unique. I think we are in a gap in the case law. I'll agree to that, absolutely. So it seems to me we're in danger of slicing this very fine. And one of the things we have to ask ourselves is how do you teach what goes on in the courtroom at the police academy? Because we really want the officers of the law to respect the decisions of the courts. And this seems to me a hard kind of case to translate into a discernible rule in a police academy course. And I don't know what the rule you would have us draw is. And to the extent that I can draw a rule from this is does an officer legitimately feel, given the totality of the circumstances, that his life may be in danger? And that's the only rule that I can draw. I can't draw a way you can only unholster your gun in this particular circumstance or that particular circumstance. You can put your finger on the trigger here but not there and everything. And that's a very difficult rule to teach to police officers in the police academy. And it seems to me that the basic rule and the one that is teachable is do you legitimately feel that your life may be at risk? And you have to credit the district court's overall impression, to some extent, on whether we quibble with this finding or that finding, if the bottom line was that he declined to suppress the evidence. And his ultimate conclusion, because he listened to the individuals involved, I assume, and his ultimate conclusion was these circumstances taken as a whole do not warrant suppression. And you might want to say in rebuttal, when you have a rebuttal, why was that an erroneous bottom line to extract from all these circumstances? I see my time is up. Well, you have rebuttal time. And maybe my colleagues, if they have further questions of you, I'm willing to, you can address that. I just have one on the firearms. So the court has said a number of times that the nexus between drugs and violence creates some level of reasonable apprehension on the part of the officer. I'm thinking of U.S. v. Psaki and maybe one or two other cases. And how would you have us distinguish those cases which seem to say that an officer who confronts someone that they think is in possession of at least some drugs can draw a firearm without violating the Fourth Amendment? I think they can draw a firearm. We're not challenging sex. So this is where the pointing and finger on the trigger is? Exactly, Your Honor. Okay. This is two steps beyond just having the gun ready. Understood. Thank you. Mr. Honnold, we'd be happy to hear from you. Good morning, Your Honors, and may it please the court. Daniel Honnold for the United States. I think I'll start with the excessive force analysis unless the court wants to start elsewhere. Just two clarifying points to begin my remarks here. First, in Foote v. Dunnigan, which Your Honors discussed with my friend here just a moment ago, some of the language from Foote says that during the stop, Foote placed both of his hands on the steering wheel, at which point Dunnigan, the officer, exited his vehicle, drew his gun, pointed it at Foote, and identified himself as a county deputy sheriff. He did not have time to display his badge. Does the excessive force claim implicate an exclusionary rule remedy, or is it properly reserved for a damages action, given the Supreme Court's skepticism of expanding the exclusionary rule because of the high social costs it's paid? Are these different questions because of the different remedial schemes that are available? There are different remedial schemes available, and as the Seventh Circuit held in – Can you put that microphone closer? Yes, Your Honor. There are different remedial schemes, as Your Honor has recognized. The Supreme Court has been very hesitant to expand the exclusionary rule to other circumstances, and this is not a circumstance in which this court should recognize the expansion here. What do I do about the fact that this court has suppressed evidence based on an excessive force violation?  So Edwards is not that case, Your Honor. Edwards was – The court did suppress – well, there was constitutionally unreasonable force, right, in Edwards. That's what the court said. It was a constitutionally unreasonable law enforcement. It wasn't a search case, right? It was a search case, Your Honor. Oh, it was a search case. Why? Because it was analyzed under Bell v. Wolfish, and the court there explicitly said that it was analyzing it under an unreasonable search doctrine. So that was the thrust of that case. That was the case in which the officers conducted a constitutionally impermissible strip search on the public street that led to the – But why are strip searches – I mean, I understand that we have this distinction doctrinally between search and seizure cases, but, I mean, there was no question that in Edwards they were allowed to search Mr. Edwards. The question was whether they were allowed to search Edwards in the particularly invasive, humiliating, graphic way they searched Mr. Edwards. I mean, I know you're going to try really hard to move that into the search bucket, but it seems like what the objection was was not they didn't have probable cause, not that they didn't have reasonable suspicion, not that they didn't have a good enough reason to search him. It's that they searched him in a way that was unconstitutional. And that – it seems really hard to just wall that off and say that's categorically different. I understand, Your Honor, but it is categorically different for a couple of different reasons. That Bell v. Wolfish and that sexually invasive line of search cases is like a discreet body of doctrine that the court was operating under, and there's no evidence that it's intended to – I can understand why the panel in Edwards ruled for the majority in Edwards ruled the way it did. The circumstances there were so hideous, I'm not going to repeat them. But at least, you know, whether it's a subject of a legal distinction or not, I don't know. But I would say that the circumstances here are dramatically different from those in Edwards. And for one thing, there's no sexual component. Yes, sir. And that makes a big difference. I think that's what separates the sexually invasive search doctrine from excessive force claims in general. And, of course, here we're dealing with the latter. I would also just point, Your Honor, to the Collins case from the Seventh Circuit. That's another case. It's citing Watson. It's talking about whether excessive force is available as a remedy, and it actually discusses Edwards and says – This is the really, really, I'll say, breezy Judge Posner opinion, or are we talking a different opinion? He just sort of declares something and just doesn't really give any reasons other than just declaring it? With respect, I think that's the Watson opinion, Your Honor, and I don't think it's quite that breezy. It's pretty breezy. He does go kind of stepwise through the factors of why suppression wouldn't be available as a remedy, including the mismatch between the interest at stake and sort of the purpose of suppression as a remedy. But Collins is actually a different opinion that Watson predated Edwards, Collins postdates Edwards, and so it had an opportunity to discuss it, and it found that it wasn't a meaningfully on-point case for basically the reasons that I'm alluding to, Your Honor. One of the things about this case is that we have a number of events about what took place when, what was the precise timing of the tase, when was the weapon drawn, what was actually seen. And so there are a number of minute questions here and findings here dealing with chronology and the sequence of things as they unfolded. But I'm wondering in this kind of case, isn't there some respect that should be paid at the end of the day to the ultimate conclusion drawn by the court that heard the evidence, and the ultimate conclusion here was that this did not warrant suppression, that the circumstances surrounding the interaction between these two individuals were sufficiently fraught and sufficiently suggestive of not just danger but of the loss of the officer's life. Yes, Your Honor. I mean, what is it, do you, this overall impression, do you certain respect because he heard the evidence and we have not? In this kind of encounter, this sort of encounter, the actual trier of fact or the person who conducts the exclusionary rule here, is it a comparative advantage to us? We're at a comparative disadvantage. And that's particularly true, I think, when there's a question of what happened when, who did what when. Is that a fair assessment? That's a fair assessment, Your Honor. The deference and the respect that this court affords to the district court who heard the evidence is in deferring to the factual findings that the court makes. I agree with that, but part of what made the circumstances here fraught and that someone, whether the officer or others, might be shot was that this particular officer testified that whenever there's any type of crime that's committed, regardless of the type of crime, it could be a misdemeanor, he's going to pull his weapon. That's what he testified to. And he also testified that that was because you never know when you're going to have to shoot someone. And what's the government's view in that regard? A couple points on that. I mean, that's not something you would, going back to what Judge Wilkinson was saying, teach at the academy, I would hope. A couple points on that, Your Honor. When we're talking about the reasonableness of the force that's employed, it's objective. I understand that. I want to know why the government thinks this particular officer's testimony and conduct, in this case and others, is all right. So the question is not do we like this officer or do we like everything that he did in a particular case. The question is whether there was a Fourth Amendment violation, whether there's a sufficient causal nexus to that unlawful conduct and the discovery of evidence, whether there would be inevitable discovery otherwise, and whether suppression is even available as a remedy. You have to check down through all of those things. But the government does not agree that whenever there's any type of crime that's committed, regardless of what type of crime it is, that the officers should pull their firearm, correct? I understand there's reasonable suspicion in this case. But the government does not countenance that viewpoint, does it? I think if read in the extreme, there are going to be problems that would flow from that in certain cases. However, there are also cases in the 1983 context where officers are drawing their firearms. Why don't you answer my good colleague's question by saying, no, there's no way in the world we would countenance that broad a rule. But wait a minute. We're looking here at a very specific situation and a specific set of circumstances, and that's what the judgment involves. But I don't know why you would hesitate at all to respond to Judge Thacker's question and say, under no circumstances does the government think that you can be just drawing your weapon as a matter of course. There has to be something a lot more than that before you draw your weapon. But Judge Thacker's right, isn't she, that this whole idea of just drawing your weapon as a routine matter, that can't be right, can it? Your Honor, I agree. And I apologize if I was a little more hesitant than I should have been in responding to that. My answer to Judge Thacker was that if that were to be true and read in the extreme, that it would create Fourth Amendment violations in certain contexts. It depends on the facts of each individual case. And the case that we have before us is not one in which the drawing of the firearm was constitutionally excessive. And indeed, my friend has abandoned that. He didn't shoot somebody in this case. Your Honor, he did not shoot somebody in this case. And I hear Your Honor adverting to, I think, the letter that my friend filed. Perhaps. There's no evidence in the record about other conduct by Officer Walker, so I don't think it's going to be a basis to conduct the analysis here. And I would encourage the Court to ignore that. I think, honestly, dovetailing back to the remedies section, that's maybe more of an analysis that would be more appropriate in a 1983 case. So can I ask you then, okay, I'm just going to say, I think there is significant force to your colleague's point that the district court's analysis seemed to really blend causation and inevitable discovery, which seem like they are conceptually separate questions. First, factual question. So as I understand inevitable discovery doctrine, it's not necessary for the government to show just that the officer could have gotten the evidence the other way, which I think he clearly could have here. But you also have to show that he would have gotten the evidence the other way. Is there any evidence in this record? Like, for example, was this officer ever asked, what would you have done had you not drawn your gun? Right? I don't see anything in the record where the officer testifies, I would have done the thing that would have gotten me the evidence. Am I right about that? There's no specific question along those lines, but there's also no legal requirement that there be a specific counterfactual question. No, but hold on. But we've been really clear on the inevitable discovery doctrine. It is not enough to say you absolutely positively could, and I've seen a lot of these cases, and the government frequently tries to argue that because we obviously could have done it, inevitable discovery applies. And this court keeps saying over and over again, it is not enough that you could have done it. You have to show that you would have done it. And I don't see anything in this record that establishes he would have done it. So I guess where I'm resisting the premise of Your Honor's question is that you don't need a specific question and answer along the lines that you're suggesting. Oh, I agree on that. But you're not fighting my premise that those are separate requirements, that both have to be met. They are separate. Yes. And Alston's very clear on that. But I would also point Your Honor to the Alston case where the district court there very clearly omitted the finding that the officer would have taken the actions that would have led to the inevitable discovery of the evidence. This court nevertheless affirmed without a remand on the basis that the evidence that existed in the record, and there's no reason to think that that counterfactual that Your Honor is positing existed in that record, it was so obvious that the ministerial steps that an officer would take in that scenario would have uncovered the evidence. And the same is true here. Remember, the officer developed probable cause for a drug distribution offense before he even opened the door to this car. No reasonable officer is going to see that conduct happen right in front of his eyes and not at the very least conduct a tariff risk. And the moment we do that, we find the gun. And the moment we do that, we find the gun. There's no dispute about that. It's on his hip. It's not, you know, hidden in any meaningful way. It would have, of course. The argument here is that the facts and circumstances would satisfy the Wood test. Yes. Yes, Your Honor. That's absolutely right. We do need an evidentiary foundation. I think this court's cases make it pretty clear that no particular form of it is required. What Judge Heitens is saying is a correct articulation of the inevitable discovery rule. It's not, oh, there's a possibility that I would have discovered. I mean, I think the question is a would question, not a could question. Yeah. It's both. Yes. Both would and could. And here there's no dispute about could. I don't hear my friend disputing that. He's not really even disputing would. He's saying the government didn't provide a sufficient evidentiary basis for the would. But we just completely disagree with that. Well, and there's no finding by the district court. So, Your Honor, J145, it says, regardless of how Officer Walker carried out this conceitedly permissible stop, he would have discovered the firearm, whether during the course of a Terry frisk or a standard search incident to arrest. And so he says he would have discovered it. This is the part. I understand you're putting the best spin you can on it, and maybe we should. But when I read the district court opinion, I do think there is force that the district court is mixing up causation and inevitable discovery. Because what the court says is the government makes three arguments against suppression. One, you can't ever suppress excessive force. Two, no causal connection. Three, there's no Fourth Amendment violation. The district court does not list inevitable discovery as one of the three grounds in which the government is seeking to oppose suppression. And it says, I'm picking option two. Option two, the court had identified as no causation. That's all true. That's all true. I will just note that we separately argued it below, but we did put it in the same causation section in our opposition. So you led the district court astray into thinking these two doctrines that are not the same are the same? They're not the same, but they are related. If you look at Utah versus Strife, it's quite clear that the district court sees these as conceptually related. Attenuation, independent source, and inevitable discovery are all doctrines that are related to the causal relationship between two events in time. So it's not really any surprise that in subsequent sentences next to each other, on JA 145, the court's going to make a no causation finding. And then in the very next sentence, adverting to the Terry stop and the search incident to arrest, he's going to make an inevitable discovery finding. He doesn't use the words explicitly inevitable discovery, but there's no real other way to read he would have conducted a Terry frisk, and he would have conducted a search incident to arrest, other than as the inevitable discovery analysis. So I think that's what we have. We also, of course, it's even more patently clear that the court did make a causation finding. We believe under Najjar and Bollett that that's basically a factual finding that's entitled to significant deference. That seems strange, given Ornelas and all kinds of Fourth Amendment doctrine where the Supreme Court says over and over and over again, the bottom line Fourth Amendment questions are always reviewed de novo. That's not correct, Your Honor, because in the inevitable discovery doctrine analysis, this is Bollett. Right. So whether they would, I agree with you that whether an officer would have done something seems like a factual finding. Right. And the ultimate decision on inevitable discovery is fundamentally a factual question that's entitled to deference. That's Bollett. In Najjar, the court says that the attenuation doctrine, that type of analysis is fundamentally a factual question that's readily susceptible to disposition by the district court. In other words, that it's entitled to deference. There's no logical reason to treat causation analysis, which is like the factual question of like, did event A cause event B? That's a classically factual question that we would expect a jury to decide in a torts case. And there's no logical reason to treat that analysis differently from attenuation and from inevitable discovery, which this court has clearly held are factual and entitled to deference. But regardless, the court was not wrong under either standard to say that the drawing of the firearm and the pointing of the firearm bore no causal relationship to the court, to the officer's discovery of Mr. Coe's firearm. That was a thing that happened because Mr. Coe was caught selling drugs out of his car and was attempting to be apprehended and arrested by the officer. It had nothing to do with the fact that the officer drew his service weapon. I see I have two minutes remaining. I think I'd like to just turn back briefly to the remedy point, unless the court has any questions on the reasonableness of the force. Oh, actually, I'm sorry. I did have, at the very beginning of my argument, I promised two corrections. One was to read that language from Foote v. Dunnegan, which shows that the officer was pointing his firearm and that that was not impermissible. The second is my friend, at multiple points during his opening argument, adverted to the notion that this officer had his finger on the trigger for some meaningful length of time during the encounter. That factual finding is not in the record. He attempted to establish it. The officer at 113 to 114 repeatedly denied it, and the district court never found it. On the standard of review that we have, this court is viewing the evidence. So we assume that didn't happen, given the district court's just – is that what you're saying? That because the district court didn't – because it was disputed and because the district court didn't find it happened, we have to assume it didn't happen. Exactly. In order to find that it would happen, you would need to basically draw a factual inference in favor of the defendant, which is impermissible at this stage, given that the government prevailed below. Now I'm down to a minute. So I'll just close by saying that the reason why suppression should not be available as a remedy here has to do both with the mismatch between the interest protected by not wanting someone to be subject to excessive force and the interest protected by suppression of evidence in general. As the Supreme Court recognized in Hudson v. Michigan in the knock-and-announce context, the interests governing knock-and-announce are very different from the reasons why you would want to suppress evidence. The same is true here. And for similar reasons, officers faced with the prospect that evidence might be suppressed in the excessive force context are not going to be deterred because officers are not using excessive force with the idea that they will uncover evidence that they wouldn't otherwise be entitled to uncover. As long as the evidence, as is conceitedly the case here, was entitled to be found due to probable cause or due to reasonable suspicion, there's simply no logical connection between the excessive force and the suppression of the evidence. And for all these reasons, we would ask that this Court affirm. Thank you. Thank you. Mr. Camden, you have rebuttal time. Mr. Camden, rather than interrupt what you were planning to say, I want to just ask you this up front. I was going to raise the thing that your colleague said at the end. Where is the factual finding that there was a finger on the trigger at any point? I was looking, and my assistants were also looking, and we cannot find any factual finding by the District Court to that effect. No, the District Court assiduously avoided having to make that factual finding by resolving it on the legal question of just causation and whether it was there. But now that the case comes to us after you lost at a suppression hearing, after an evidentiary hearing, don't we have to construe all facts in favor of the government? So if the District Court didn't make a finding that it happened, don't we have to assume it didn't happen? No, Your Honor. What's your authority for that proposition? Well, simply because there was never a finding one way or the other on it. Sorry, what's your authority for that? I know there wasn't a finding, but I think I can recite case after case after case after case that says after an evidentiary hearing, we construe all facts in the light most favorable to the party that won below, that's them. And so in the absence of a finding that something happened, why don't we have to assume the true facts are that it didn't happen? Well, the District Court's findings are reviewed for clear error. Sure. Where in your brief do you say that was clearly erroneous for the District Court not to find that the finger was on the trigger? I don't believe it was specifically argued as a point of reference. I don't think it's argued anywhere in your brief. So what do you base that on, that the finger was on the trigger, when the officer denied it and the court didn't make a finding? Oh, it's right there in high-definition video from a camera that was about six inches away. So on the video itself? Yes, Your Honor. Which, though maybe argument heading one of the brief could have been, the District Court clearly erred in not finding the officer's finger was on the trigger, but it's not in your opening brief. Well, Your Honor, I think the District Court never reached the factual question of whether force was used because it avoided it by making this legal error in the first case. So if the court were to find that there was an error in finding no causation here, that actually pulling out the gun, sticking it in his ribs with his elbow on him, actually led Mr. Cope to start to flee and that there was causation because this was just an unbroken. One thing I'm concerned about here is the possibility of losing the forest for the trees. And I always like to ask myself, well, what would the takeaway from this case be if we were to reverse the District Court in this situation and order a suppression remedy? I worry that the takeaway would be that even in situations where there was some legitimate fear that an officer's life was on the line, an officer has been frozen by the courts into a posture of inaction, and that once one clears away all the bramble bush, the ultimate takeaway might be in these sorts of circumstances which officers encounter not infrequently. The officer has been told by the court that reasonable protective measures to save one's own life are not possible. And that's a real tough takeaway from the case. You can immerse yourself in the details of it, and some of them, frankly, are a bit fuzzy to me. But the overall point that would be drawn from this case gives rise to some apprehension on my part. Actually, I'll make it very easy, Your Honor. I agree with the court that the standard should be that an officer is allowed to use deadly force or the threat of deadly force. What's the discernible limiting principle here? When an officer reasonably believes that his life is in danger, he's absolutely entitled to use deadly force or the threat of deadly force. But I think the problem we've got here is the record, and we need to hammer down the timeline. I usually don't go back and do the timeline here, but I think it's worth it. In this case, JA95, he testifies he opened the door and attempted to grab Mr. Coe. JA101, he says he did not see the firearm until the body-worn camera was knocked off. So everything you see on the body-worn camera is before he saw a firearm. It is exactly how he treats a citizen whom he sees in the community for whom she suspects of a drug crime when there's no evidence of a firearm. He didn't see the firearm until they're struggling. And that struggle was because he was trying to get away because the officer had put a gun in his ribs, essentially. So the record here is that he had this encounter thinking he was just dealing drugs. He had white powder in his lap, and the response is pull out a gun, finger on the trigger, and put it up against Mr. Coe's side. So that's the record we have. In a case where the officer reasonably believes because somebody is armed or because there's furtive movements or somebody's reaching for their belt or somebody is driving a car at them, that they believe reasonably that deadly force is necessary to protect their life, they absolutely have the power and the authority and the right, in fact, to defend themselves. But this isn't that case. This is a case where somebody has white powder on their lap, is pulled out of the car with an elbow, and a gun in their ribs. So the ‑‑ So does the resolution of the case depend upon the exact angle at which somebody's arm is? Is that a principle that one can discern or whatever? I mean, you've been all ‑‑ during your argument, you've been going like this and been going like this with your arms in different directions, and I don't fault you for that. That's a legitimate point for you to make. But what kind of principle can we draw from the fact that arms are this way or that way or another way or what have you? I mean, this is a bit of a problem, but at any rate, we've given you a little bit of extra time, and I'm going to ask my ‑‑ Judge Hyten, you had any? I'm good. We have no further questions of you, but I would like to acknowledge the fact that you're court‑assigned, court‑appointed, and you've done an admirable job, and I thank you. I appreciate the opportunity, Your Honor. Thank you.
judges: J. Harvie Wilkinson III, Stephanie D. Thacker, Toby J. Heytens